IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SALLIE ANN JOHNSON,       )
                             )
        Plaintiff,         )
                             )
    v.                  )     CIVIL ACTION NO. 3:10CV563-SRW
                             )           (WO)
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                             )
        Defendant.      )

## MEMORANDUM OF OPINION

Plaintiff Sallie Johnson brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff was born on September 16, 1953, and completed high school in 1972. (R. 140, 142). She worked in the textile industry as a sewing machine operator, folder, packer, and line balancer in 1973, 1976 and from 1978 through 1999. (R. 125, 135). In December 2001, plaintiff stopped working, due to her mother's illness. (R. 134).[1] Records from Vester

---

[1] Plaintiff's application does not indicate the nature of the work she performed between 1999 and December 2001. While plaintiff states in her disability report that she stopped working in December 2001,

Health Clinic include treatment notes from four office visits in 1999 and two office visits each year in 2001, 2002 and 2003, most often for follow-up of hypertension. (R. 178-83).[2] In late 2002, plaintiff was diagnosed with Type II non-insulin-dependent diabetes mellitus. (R. 179, 181). In her only visit to the clinic in 2004, plaintiff complained of hot flashes and irregular menstruation. (R. 178). On April 22, 2005, over eight months later, plaintiff returned for follow-up, complaining of swelling in her eyes. On evaluation, her eyes were noted to be puffy but not tender to palpation. Plaintiff further complained that she could not bend her left thumb; she said that she had been given a splint and medication at the EAMC emergency room. (R. 177). Plaintiff returned to the office six weeks later, reporting that she still could not bend her left thumb and that, "when she does bend it, can't get it to extend again unless she assists it." Her physician scheduled her for an appointment with Dr. Scott, an orthopedic physician in Opelika. (Id.).[3]

At her next office visit three months later, on August 29, 2005, plaintiff complained of right leg pain, soreness in her left shoulder and arm, and that her left calf "will get painful on walking, standing or sitting." Examination of her upper extremities were normal with normal range of motion. The only abnormality noted as to her legs was that she had pain in

---

her physician noted on January 5, 2001, that plaintiff "[t]akes care of her mother @ home, no longer working at Russells." (R. 180).

[2] Plaintiff's treatment record from Vester Health Clinic includes notes of telephone calls, prescriptions call-ins and labs without examination by a physician; the court here summarizes only the office visits with a physician. (See Exhibits 3F, 8F).

[3] The record includes no treatment notes from Dr. Scott, and plaintiff did not identify him in her disability reports as one of her physicians. (R. 136-39, 146-48).

2

her right knee on squatting. Her physician diagnosed "? neuropathic pain" as to plaintiff's right leg and "? arthritic pain" in her left shoulder. (R. 176). On October 31, 2005, plaintiff's previous application for disability insurance benefits was denied. (R. 116).

Plaintiff did not again seek treatment at the clinic until January 2006. On January 9, 2006, she reported a "knot" behind her right ear and burning pain in both lower legs. She stated that she had no numbness in her legs but that, for the previous two to three weeks, her "legs get hot/cold[.]" The doctor noted no abnormalities on examination of plaintiff's legs; diagnosed "? peripheral neuropathy [secondary to] DM," a "benign appearing" earlobe lesion, and Type II non-insulin-dependent diabetes mellitus; and prescribed Naprosyn and Neosporin ointment. (R. 176).

The following month, on February 3, 2006, plaintiff sought treatment at the clinic for chest discomfort. She reported shortness of breath with pain when walking, and said that her left thumb "gets numb" every day since the previous Tuesday. Plaintiff's physician performed an EKG and referred plaintiff to Dr. Williams, a cardiologist, for further evaluation. (R. 175). Dr. Robert Ingram, another cardiologist in Dr. Williams' practice, evaluated plaintiff that day. She reported dyspnea on exertion for the previous two weeks and chest pain radiating down her left arm while at rest for the previous five days, of increasing frequency and severity, with nausea and sweating but no loss of consciousness. Dr. Ingram reviewed the EKG sent by Dr. T. Vester and determined that it showed anterior changes consistent with unstable angina. He discussed plaintiff's case with Dr. Williams and admitted plaintiff to the East Alabama Medical Center. (Exhibit 1F, R. 160-65). Plaintiff

3

remained at EAMC overnight. Dr. Williams performed a cardiac catheterization the following morning, finding no significant coronary artery disease and "concentric left ventricular hypertrophy in a setting of hypertension, consistent with hypertensive heart disease with normal left ventricular systolic function." (R. 173). Dr. Williams stated that he "suspect[ed] her discomfort is not cardiac in nature." He prescribed Protonix,[4] and advised plaintiff to "follow up with Dr. Terry Vester in one to two weeks." (Id.). Plaintiff was discharged from the hospital early that evening. (Exhibit 2F, R. 167-73).

On February 7, 2006, three days after her discharge from the hospital, plaintiff filed the present application for supplemental security income. She alleged that she became disabled on October 22, 2005, due to arthritis, diabetes, high blood pressure, acid reflux, and carpal tunnel syndrome. She reported pain, stiffness and swelling in both legs due to arthritis, dizziness and drowsiness due to diabetes, headaches due to hypertension, chest pain due to acid reflux and pain and numbness due to carpal tunnel syndrome. Plaintiff indicated that she is unable to use her left hand, to stand for very long, or to lift. (R. 104-07, 134).

Plaintiff returned to Vester Health Clinic for follow up of her chest pain on February 10, 2006. Her physician diagnosed "Type 2 NIDDM [with] peripheral neuropathy," "GERD" and "SOB [with] exertion." (R. 175).[5] Plaintiff was next evaluated on June 19, 2006, when

---

[4] Protonix is used for treatment of esophagitis associated with gastroesophageal reflux disease ("GERD"). *Physician's Desk Reference* (64th ed. 2010) at pp. 3571-75.

[5] There is a partial ER report included in Exhibit 7F showing that plaintiff sought treatment on November 26, 2006, for "one week of right side pain" which increased with deep breathing and movement. She told the ER doctor that "she was treated for muscle strain by her doctor and it has only helped somewhat." (R. 215). The Vester Health Center records include no indication of treatment in November 2006 (see R. 241), and plaintiff submitted no records of treatment for muscle strain other than the single-page, partial ER report.

she reported paraspinal muscle pain and that her right eye was swollen and runny in the morning.  She further indicated that her left hand was numb with activity and that she had seen an orthopedic doctor in the past and was given a wrist injection.  On examination, her left hand grip strength was 5/5 with normal range of motion and no pain on palpation.  Plaintiff's doctor diagnosed diabetes and hypertension.  (R. 241).

Late on the evening of March 3, 2007, plaintiff went to the emergency room at Lanier hospital in Valley, complaining of chest pain which had lasted for thirty minutes, with left leg pain.  The ER physician diagnosed an acute myocardial infarction and admitted plaintiff to the ICU, where she was treated with IV medications.  Dr. Venkatapuham Reddy observed that an echocardiogram performed during plaintiff's admission revealed excellent left and right ventricular function, mild concentric left ventricular hypertrophy, and no obvious stenosis of the aortic valve.  Dr. Reddy noted moderate tricuspid valve insufficiency and mild mitral valve regurgitation and concluded, "Cannot exclude mitral valve prolapse but normal ejection fraction at 70%."   Plaintiff was discharged on the morning of March 5, 2007, with appointments to follow up with Dr. Vester in two weeks and with Dr. Reddy in one month.  (R. 218-34).

At her two-week follow-up appointment on March 23, 2007, plaintiff told Dr. Vester that she "[w]as having chest pain + passed out."[6] She reported that she was slightly dizzy with watery eyes, but that she had experienced no further chest pain.  Dr. Vester diagnosed

---

[6]  The notes of plaintiff's report to the Lanier ER physician indicates no associated symptom of syncope; the ER nursing record of plaintiff's chief complaints likewise includes no reference to an episode of passing out or syncope.  (R. 224, 228).

hypertension and a "syncopal episode re. hosp[,]" continued plaintiff on her present medications and added Nexium,, and indicated "Await GHLH - hosp. records." A subsequent note dated that same day states, "Reviewed GHLH - had low K$^+$ + Mg.  May benefit from ACE + D/C HCTZ."  (R. 240).

Two months later, on May 22, 2007, Dr. Vester diagnosed bronchits, hypertension and Type 2 diabetes mellitus, when plaintiff appeared complaining that her chest hurt and she had a bad, productive cough.  In mid-September 2007, plaintiff was evaluated for her complaint of pain and swelling of her right eyelid.  She also reported pain in her right hand and thumb. Dr. Al Vester diagnosed right wrist and hand pain and conjunctivitis, and referred plaintiff for evaluation by an orthopedic surgeon.  (R. 239).[7]  The following month, plaintiff was diagnosed with facial dermatitis and conjunctivitis when she sought treatment for a facial rash since the previous week and a watery right eye.  (R. 238).[8]

On October 10, 2007, Disability Determination Services sent plaintiff to a neurologist for electrophysiological evaluation.  The neurologist conducted a nerve conduction study and electromyogram and concluded that it was "indicative of bilateral, mild to moderate distal medial neuropathy, namely carpal tunnel syndrome."  (R. 190-91).  On October 18, 2007, plaintiff appeared for a consultative physical examination by Dr. Robert Walkup of Internal

---

[7]  The record includes no treatment notes from an orthopedic surgeon.

[8]  Plaintiff telephoned the office on September 26, 2007, complaining of "giving out of breath[]" when walking and sweating a lot more than normal.  She was advised to rest and told that she could see "Dr. Terry" on September 28th or that "we can make her an appt. to see cardiologist."  There is no record of a visit to a cardiologist at that time, and no indication that plaintiff saw "Dr. Terry" on the 28th of September. (R. 238).

Medicine Associates, P.C. in Opelika.  After examining the plaintiff, Dr. Walkup completed a medical source opinion indicating that plaintiff can perform the exertional requirements of light work, with some additional limitations.  (Exhibit 6F, R. 192-200).

On December 31, 2007, plaintiff was admitted to EAMC after she appeared at the ER complaining of chest pain lasting for three days. She was admitted for observation and treatment by Dr. Williams.  After she had chest pain during a stress test, which was positive for anterior ischemia, plaintiff had another heart catheterization.  The cardiac catheterization, which was conducted on January 3, 2008, according to Dr. Williams, "revealed minor coronary artery disease and no renal artery stenosis.  She had normal left ventricular ejection fraction.  She also notably had no aortic stenosis."  (R. 205).  Plaintiff was discharged home in stable condition. (Id.). In a follow-up visit with Dr. Williams on February 1, 2008, plaintiff told the intake nurse that her left hand and legs had hurt occasionally since discharge from the hospital.  Dr. Williams noted that plaintiff reported "some numbness to her left hand and foot."  He stated that "[h]er exam is negative."  Dr. Williams "encouraged [plaintiff] to be active" and asked her to return in a year for follow up.  (R. 248-49).

Plaintiff next sought treatment from Dr. Vester on May 5, 2008, her first visit to the clinic since the previous October. She reported lesions in her scalp for the previous two weeks.  Dr. Vester diagnosed a scalp infection.  The treatment note concludes, "On the way out handed forms[.] [Right] hand numb."  (R. 237).   That day, Dr. Terry Vester completed a medical source statement indicating that plaintiff can lift 5 pounds occasionally and one pound frequently; that she can sit for a total of four hours and stand or walk for a total of one

hour in an eight-hour work day; and that she can rarely push and pull arm or leg controls, bend, stoop, or reach, and never climb, balance, operate a motor vehicle, work with or around hazardous machinery, or perform gross or fine manipulation. Dr. Vester indicated that plaintiff would be absent from work more than four days each month as a result of her impairments or treatment.  In response to the prompt, "State the medical basis and the diagnosis for these restrictions[,]" Dr. Vester wrote, "Chronic complain ® hand discomfort + ® LE discomfort." Dr. Vester indicated that she believed plaintiff's complaints of pain but responded "No" to the question, "Is there objective evidence which could reasonably be expected to cause this degree of pain?"  Dr. Vester wrote, "Possible CTS, requires further evaluation – proved by NCS/EMG report 10/10/07. Dr. Vester rated plaintiff's pain as "Severe." In response to the question, "Is the patient taking any medication that would adversely affect the ability to work[,]" Dr. Vester responded affirmatively and wrote "Robaxin – possible drowsiness."  (R. 245-47).[9]

On June 16, 2008, an ALJ conducted an administrative hearing, during which he heard testimony from the plaintiff and from a vocational expert. (R. 28-68).  The ALJ rendered a decision on August 28, 2008.  He determined that plaintiff has "severe" impairments of "non-cardiac chest pain; gastroesophageal reflux disease; type II non-insulin dependent diabetes mellitus; carpal tunnel syndrome; peripheral neuropathy; and hypertension."  (R. 25).  He found that plaintiff does not have an impairment or combination of impairments that meets

---

[9]  Dr. Vester had prescribed Robaxin for plaintiff for the first time that same day.  (R. 237; see Exhibits 3F, 8F).  Plaintiff testified at the hearing that she experienced no side effects from the medication she was then taking.  (R. 42, 153).

or medically equals the severity of any of the impairments in the "listings." (R. 25). He further concluded that plaintiff retained the residual functional capacity to perform light work with the following limitations:

> The claimant requires work which allows for a sit/stand option. The claimant can frequently use her hands for repetitive actions such as in simple grasping, the pushing and pulling of arm controls, and for fine manipulation. She can frequently use [her] right leg for repetitive movement such as in the pushing and pulling of leg controls and occasionally use her left leg for repetitive movement such as in the pushing and pulling of leg controls. She can occasionally climb, balance, stoop, or kneel; never crouch or crawl; and frequently reach overhead. She can occasionally work around unprotected heights, moving machinery, and exposure to marked changes in temperature and humidity. She can frequently drive automotive equipment. In addition, the claimant experiences a moderate degree of pain.

(R. 25). He determined that she is unable to perform her past relevant work, but that there are a significant number of jobs in the national economy which the plaintiff can perform, including assembler, inspector/checker, and machine packer. (R. 25-26). The ALJ concluded that plaintiff has not been under a disability as defined in the Social Security Act at any time through the date of his decision. (R. 26). On May 11, 2010, the Appeals Council denied plaintiff's request for review (R. 1-5) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Treating Physician's Opinion

Plaintiff argues that the ALJ committed "clear error" when he concluded that Dr. Terry Vester was not plaintiff's treating physician, and that he compounded that error by formulating an RFC assessment "allowing greater exertional capacity than what Dr. Terry Vester believed his [sic] patient could sustain."  Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to give good reasons for rejecting Dr. Terry Vester's opinion.  (Plaintiff's brief, pp. 1-2).

The records from Vester Health Clinic are handwritten. The treatment notes for plaintiff's office visits during the relevant period do not include a legible signature by Dr. Terry Vester, nor do they include a stamp bearing Dr. Vester's name.  Many of the notes conclude with an illegible mark which may be an initial or initials, but which do not appear to include either a "T" or a "V."  (Exhibits 3F, 8F).  Plaintiff's office identified Exhibit 8F,

10

medical records covering the period from May 2006 through May 2008, as those of Dr. Al Vester. (R. 236). However, there are also notes written by staff members in Exhibit 8F referring to "Dr. Terry" and, once each, to "Dr. Terry Vester" and "Dr. T Vester." (R. 238-41). Additionally, the cover sheet transmitting the medical records in Exhibit 3F, for the period from January 1999 through February 2006 is signed by Terry Vester. (R. 174). Exhibit 3F includes legible references by staff members to "Dr. Terry" and "Dr. T Vester" in 2001 and 2002 (R. 180, 181) and a few legible signatures reading, "T Vester MD" in 1999 (R. 182, 183).

In her disability report, plaintiff identified Dr. Terry Yvonne Vester as a physician she had seen for several years (R. 137) and, during the consultative examination, she identified Dr. Terry Vester as her primary care physician (R. 192). Records and notes from other physicians identify "T Vester" or "Dr. Terry Vester" as plaintiff's primary or referring physician, or copy "Terry Vester" on reports (see e.g., R. 165, 172,173, 208, 213, 217, 249). Dr. Williams addressed the report of his February 2008 follow-up to "Dr. Terry Vester." (R. 248). Accordingly, plaintiff is correct that the ALJ's conclusion that Dr. Terry Vester is not plaintiff's treating physician is not supported by substantial evidence.[10]

However, the ALJ's error in concluding that Dr. Terry Vester is not plaintiff's treating

---

[10] See 20 C.F.R. § 416.902 ("*Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).")(italics in original).

physician is harmless.  It is apparent from the ALJ's RFC assessment, as plaintiff argues, that the ALJ rejected Dr. Vester's medical source opinion as expressed in Exhibit 9F.  An ALJ may reject the opinion of a treating physician if he articulates good cause for doing so.  The Eleventh Circuit has found good cause for discounting a treating physician's report when the report "'is not accompanied by objective medical evidence or is wholly conclusory.'" Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)(quoting Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.1991)).  Additionally, there is good cause to reject the opinion where the treating physicians' opinions are "inconsistent with their own medical records," Roth v. Astrue, 249 Fed. Appx 167, 168 (11th Cir. 2007)(citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) or "when the opinion appears to be based primarily on the claimant's subjective complaints of pain." Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007)(citing Crawford, supra).  "The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  Carson v. Commissioner of Social Sec., 373 Fed. Appx. 986, 988 (11th Cir. Apr. 20, 2010)(citing Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)).

The ALJ noted that Dr. Vester's opinion regarding plaintiff's restrictions is "inconsistent with the medical evidence when considered in its entirety."  (R. 22). In the paragraph immediately preceding the one containing this conclusion, the ALJ stated that the record demonstrates that plaintiff's diabetes is under fair control with medication, that she receives treatment for her hypertension, that her heart catheterization showed only minor

coronary artery disease with a normal left ventricular ejection fraction of 70%,[11] and that "Dr. Al Vester's (her treating physician) medical records do not indicate the claimant's medically determinable impairments prevent her from performing work activities at the light level of exertion."  (R. 22).  It is true that the ALJ erred in concluding that the treatment records at Exhibits 3F and 8F were those of Dr. Al Vester; these medical records reflected treatment both by Dr. Terry Vester and Dr. Al Vester.  However, as the ALJ found, the restrictions identified in Dr. Terry Vester's medical source opinion are not supported by the treatment notes from Vester Health Clinic, summarized above, nor are they supported by the other evidence of record.[12]  While the ALJ erred in finding that Dr. Terry Vester was not plaintiff's treating physician, he nevertheless stated good cause, supported by substantial evidence, for rejecting Dr. Vester's opinion – all that he is required to do to reject a treating physician's opinion.[13]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the

---

[11] As plaintiff argues, the ALJ mistakenly attributed the report of the heart catheterization to Dr. Al Vester. (Plaintiff's brief, pp. 10-11). The ALJ's statement regarding the underlying heart catheterization is substantially accurate, but the report was from Dr. Williams, the cardiologist. (R. 172-73, 213-14).

[12] By way of example, Exhibit 9F includes Dr. Vester's medical source opinion that plaintiff suffers from debilitating pain and "discomfort" and also includes a notation of plaintiff's report to Dr. Williams three months earlier of occasional hand and leg pain. (Exhibit 9F). Dr. Vester states that her conclusions are based on plaintiff's chronic complaints of discomfort in her *right* hand and *right* lower extremity; plaintiff testified that she has problems "only in [her] left wrist and hand" and only in her left leg. (R. 50-51).

[13] The ALJ gave substantial weight to the opinion of the physician who performed the consultative examination. While Dr. Walkup did not have the NCS/EMG report before him when he rendered his opinion, he nevertheless credited plaintiff's complaint of left wrist pain in determining her restrictions.  (R. 198).

Commissioner is supported by substantial evidence and proper application of the law.

Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 15th day of September, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE